## BOUTIN et al. v. RUDD.

(Circuit Court of Appeals, Seventh Circuit. October 14, 1897.)

No. 398.

1. ADMIRALTY JURISDICTION—EXECUTORY MARITIME CONTRACTS.

The fact that a contract of a maritime character has never been executed, but remains executory, does not affect the admiralty jurisdiction to award damages for the breach thereof. Insurance Co. v. Dunham, 11 Wall. 1, applied.

2. SAME—SUITS IN REM AND IN PERSONAM.

The existence of admiralty jurisdiction in a suit in personam is not dependent upon the existence of a right to proceed in rem: for jurisdiction depends, not upon the existence of a maritime lien, but on the subject-matter of the contract.

3. DAMAGES FOR BREACH OF CONTRACT.

If a contract is made under special circumstances, communicated to both parties, the damages recoverable for a breach are not only those arising naturally, according to the usual course of things, but also those which would ordinarily follow from a breach under the special circumstances so known and communicated.

4. SAME—TOWAGE CONTRACT.

A tug owner, who failed for several days to fulfill his contract to go and tow in a small schooner which had broken from her moorings in a gale, and had been found, and placed, in a leaky condition, in an unsafe place, *held* liable for the loss of the schooner, which was driven upon the rocks by a subsequent storm, it appearing that the fact of her danger and her leaky condition was communicated to him at the time of the contract.

Appeal from the District Court of the United States for the Western District of Wisconsin.

The appellee, Charles P. Rudd, the owner of the schooner Annie R., filed his libel in personam in the district court against the appellants, who were the owners of the steam tug N. Boutin, asking the court to pronounce for the damages sustained by the loss of the schooner through breach of an executory contract made by the appellants. The case disclosed was this: On the 25th day of September, 1894, the schooner Annie R. broke from her anchorage at Bass Island, in Lake Superior, during a gale from the south, and drifted to Oak Island. The fact became known to the agent of the libelant at Bass Island early in the morning of that day, who proceeded by boat to Bayfield on the mainland, and, as he claims, communicated to the respondents below, appellants here, the facts stated with respect to the schooner, and employed them to go with their tug to the rescue of the vessel, to which Boutin responded, as the agent states, that he would go with his tug, and tow the vessel to Bayfield, but that he was then fixing the tug, and it was blowing heavily, but that, if it calmed that night or the next day, he would go to the rescue of the schooner, and tow her to Bayfield, and that the agent might depend upon him to tow the vessel, and moor her at Pike's dock, Bayfield; and it was promised that the owners of the tug should receive compensation for the service to be rendered. The vessel was seen about 7 o'clock in the morning of that day by one Conlin,

who was logging at Oak Island, drifting up the channel from Bass Island, and afterwards to strike on the rocks at Point Detour. He thereupon, with the assistance of two or three men, heaved the vessel off from the shore, made sail, attempting to return her to Bass Island, but, being unable, on account of the quantity of water in the vessel, to sail her against the head wind, proceeded with a fair wind to Presque Isle, and moored her there at a stone quarry dock, 150 feet in length, fastening the vessel with a rope, chain, and two pieces of cable. The vessel at that time was leaking, and had about a foot and a half of water in her hold. The location of the vessel was communicated to the agent of the libelant on the following day, and he thereupon sent a messenger from Bass Island to Bayfield, who, on the afternoon of that day, notified Boutin that the vessel was at Presque Isle dock. The latter asked if there was much water in her, and the messenger replied that she had considerable water in her. He states that to his request that the tug should go for the boat Boutin replied that, as soon as his son, the captain, returned, they would go for the boat, and tow her to one of the slips in Bayfield. It was further proven that Boutin, Jr., returned on Thursday, the 27th. The respondents below claim that the tug was out of commission, and that their agreement was that the tug would go for the boat if they could get an engineer, and that they were unable to obtain one. There were other tugs employed in like service at Bayfield. The vessel was seen on Saturday afternoon, the 29th of September, at the dock at Presque Isle. This dock was in an exposed situation, and was a dangerous place for vessels during a storm. Calm weather prevailed until Saturday night or Sunday, September 30th, when a heavy gale sprung up. On Monday, the 1st of October, it was discovered that the schooner had broken from her moorings, and had gone ashore upon the rocks, and was a total wreck. The court below pronounced for the libelant, and its decree is brought here for review.

C. E. Kremer and W. M. Tompkins, for appellants.

F. E. Searle and H. R. Spencer, for appellee.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

JENKINS, Circuit Judge, after stating the facts, delivered the opinion of the court.

It is objected to this decree that the contract in question, being executory, and having never been performed, does not come within the admiralty jurisdiction. After 55 years of contention touching the correctness of the doctrine declared by Mr. Justice Story in the celebrated case of De Lovio v. Boit, 2 Gall. 398, Fed. Cas. No. 3,776, in which that distinguished jurist repudiated the limitation upon the admiralty jurisdiction declared by the courts of England that it related only to "things done upon the sea," and asserted that its jurisdiction extended to "things pertaining to the sea," the supreme court, in Insurance Co. v. Dunham, 11 Wall. 1, 26, ruled that the true criterion of admiralty jurisdiction with respect to contracts "is the nature and subject-matter of the contract, as whether it was a maritime contract having reference to maritime service or maritime transactions," and that the maritime nature of the contract is not dependent upon locality, but upon subject-matter. If the contract contemplate maritime service, and have reference to maritime transactions, it is within the jurisdiction of the admirality. This doctrine is no longer subject to contention. Since that decision, and within the principle declared, it has been held, and, we think, without dissent, that executory contracts of a maritime character are within the jurisdiction of the admiralty, and that damages for breach of such a contract may be award-

ed by the courts of admiralty. The James McMahon, 10 Ben. 103, Fed. Cas. No. 7,197; The Williams, Brown, Adm. 208, Fed. Cas. No. 17,710; Maury v. Culliford, 10 Fed. 388; The Monte A., 12 Fed. 331; The J. F. Warner, 22 Fed. 345; The Alberto, 24 Fed. 381; The Calabria, Id. 607; The Gilbert Knapp, 37 Fed. 215; The Electron, 48 Fed. 689; Haller v. Fox, 51 Fed. 298. In some of the reported cases prior to the decision of the supreme court referred to, there were shadowy and overnice distinctions with regard to the maritime nature of contracts, and with respect to proceedings in a court of admiralty for their enforcement; some of them asserting that there could be no proceeding in personam unless a proceeding in rem could also be sustained. This distinction cannot be upheld upon principle, nor, since the decision in Insurance Co. v. Dunham, upon authority. The jurisdiction of the admiralty is not dependent upon the existence of a maritime lien. It is rested upon the subject-matter of the contract. A proceeding in personam is not ancillary to a proceeding in rem. The one is to enforce a right growing out of a maritime transaction; the other, to assert a right against the vessel as a jus in re,—a proprietary right, claim, or privilege in the thing itself. But, as Mr. Benedict observes, this distinction between proceedings in rem and in personam has no proper relation to the question of jurisdiction (Ben. Adm. § 204); and, as Mr. Henry states the proposition, the maritime lien is said to arise from the jurisdiction of the court, not the jurisdiction from the lien (Henry, Adm. § 15). We have no occasion here to determine whether, for breach of an executory contract, a maritime lien is allowed upon the contracting vessel, and express no opinion upon that subject. The contract here alleged was to render towage service to a vessel in distress, and, beyond question, was maritime in its character. The admiralty, therefore, has jurisdiction, at least in personam, to pronounce for a breach of it.

With respect to the facts of the case, we cannot differ from the conclusion to which the court below arrived. It is undoubted that the appellants agreed to go to the assistance of the vessel in distress. We cannot credit the statement that the engagement so to do was dependent upon the appellants' securing the services of an engineer. It is not credible that the agent of the libelant would have rested upon any such contingency when he could have procured other tugs for the service; and it is clear that his subsequent inaction was because, as he thought, he could rest securely at his home at Bass Island in the belief that the appellants had performed their contract, and secured the vessel in the harbor at Bayfield. A review of the evidence, to state which would serve no good purpose, satisfies us that the claim with respect to the engineer is a mere subterfuge to avoid responsibility for a broken contract.

The last objection raised to the decree has respect to the measure of damages for the breach of the contract. It is claimed that the damages are remote, and that the breach of the contract was not the proximate cause of the loss of the vessel. The rule with respect to damages arising from breach of contract is thus stated and settled: The damages which one ought to recover in respect to a breach of contract

should be such as may fairly and reasonably be considered either arising naturally—that is, according to the usual course of things—from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it; and, if the special circumstances under which the contract was made were communicated and known to both parties, the damages resulting from the breach of such a contract which they would reasonably contemplate would be the amount of injury which would ordinarily follow from a breach of the contract under the special circumstances so known and communicated,—that is, that both the consequences naturally following from the breach and such consequences as seem natural only in the light of special circumstances communicated to the defendant at the time of the contract can be recovered. It would be otherwise, however, if the special circumstances were unknown to the party breaking the contract. Hadley v. Baxendale, 9 Exch. 347; Hobbs v. Railway Co., L. R. 10 Q. B. 111; Hamlin v. Railway Co., 1 Hurl. & N. 408; Cory v. Ship-Building Co., L. R. 3 Q. B. 181; Hammond v. Bussey, 20 Q. B. Div. 79; Griffin v. Colver, 16 N. Y. 489; Baldwin v. Telegraph Co., 45 N. Y. 744; Booth v. Mill Co., 60 N. Y. 487. Here the special circumstances were fully disclosed. The appellants, at the time of entering into the contract, were inform 1 that this vessel was adrift or ashore at Oak Island. The next day they were informed that she had been moored at the dock at Presque Isle. They knew that the vessel was leaking, and had water in her hold. They knew that she was in distress. They knew that she was moored at a dangerous place, and at a season of the year when gales are usual, and should reasonably have been anticipated. They had no right to suppose that the vessel had a crew. She was used to carry wood, and was not in commission, and had drifted from her moorings in a gale without a crew. She was rescued, for the time being, from her dangerous position on the rocks, and moored at Presque Isle, at the only available, but yet an unsafe, place. The circumstances demanded immediate and diligent action, not laggard performance nor shuffling effort to evade. All necessary facts were communicated to the appellants, which disclosed the emergency; and advised them of the need of immediate action. That the vessel might be lost through delay was apparent, and was, manifestly, we think, a result to be reasonably contemplated from failure of performance of the contract, and one which would ordinarily and naturally flow from such failure to perform. The exposed location of the vessel, the time of year, the customary season of storms, her leaky condition, all demanded promptness in discharge of the duty assumed. Under such circumstances the owners of the tug must be held responsible for the loss of the vessel. The W. E. Cheney, 6 Ben. 178, Fed. Cas. No. 17,344; The Elmira, Fed. Cas. No. 4,417; Connolly v. Ross, 11 Fed. 342; The Snap, 24 Fed. 504; Wilson v. Sibley, 36 Fed. 379; The Sarah and The Tucker, 38 Fed. 252; The A. M. Ball, 43 Fed. 170; The American Eagle, 54 Fed. 1010; The Charles Runyon, 5 C. C. A. 514, 56 Fed. 312; Phœnix Towing & Transp. Co. v. Mayor, etc., 60 Fed. 1019. The decree is affirmed.